Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On the date of plaintiff's alleged injury, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant.
3. Plaintiff's average weekly wage may be determined from a Form 22, Wage Chart, prepared by defendant and submitted to the undersigned on 20 March 1998.
4. Plaintiff's answers to defendant's interrogatories, plaintiff's medical records, a letter from defendant dated 5 November 1997, an accident investigation report, a job description, a short term disability benefits form, a request for medical leave form and plaintiff's recorded statement are admitted into evidence.
5. A 15 February 1997 office note from Steven C. Merrill, M.D., is admitted into evidence.
6. If the parties called Dr. Merrill as a witness in this case, he would have testified:
 a. "That carpal tunnel syndrome in the employee was diagnosed by Dr. Merrill after testing beginning February 15, 1997 had ruled out other possible causes and after the employee had been referred to Dr. Rosenfeld who had NCV studies done indicating carpal tunnel syndrome."
 b. "That the employee was on work restrictions beginning March 3, 1997."
7. Plaintiff last worked for defendant on 5 March 1997. Plaintiff worked one-half day on 5 March 1997.
 EVIDENTIARY RULINGS
The objections appearing in the depositions of Dr. DeFranzo and Mr. Gorrod are OVERRULED.
 ***********
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. Plaintiff began working for defendant in 1987. From 1987 through 1992, he worked as a "manual cutter." In this position, plaintiff was required to lift rolls of fabric onto a large cutting table and manually unroll the fabric across the table. After unrolling the fabric, he placed cardboard or plastic pattern templates onto the fabric. Next, he used a crayon or chalk stick to trace around the template and mark the fabric for cutting. After removing the templates from the fabric, he used a combination of electric knives and manual scissors to cut the fabric along the traced pattern lines. The electric knife was equipped with wheels that allowed it to be pushed and pulled along the cutting table. Plaintiff was right hand dominant and maneuvered the electric knife with his right hand and arm while holding the knife's round, extended handle. Plaintiff wore a steel mesh glove on his left hand. Plaintiff used his left hand to steady and smooth the fabric as he cut it with the electric knife. After cutting the patterns from the fabric, plaintiff collected the patterns into bundles and carried them to another workstation.
2. In 1992, plaintiff began working in an "automated cutter" position. In this position, plaintiff and a co-worker operated a computer-driven, fabric cutting machine to cut fabric patterns from rolls of cloth. The two primary responsibilities were to operate the machine and to off-load cut patterns from the cutting table. The two persons assigned to the automated cutting machine alternated between these two responsibilities.
3. The machine operator sat at a computer monitor, using keystrokes and a mouse to enter data into the computer that then directed the machine to cut specified patterns from the fabric. When working as the machine operator, plaintiff was also responsible for loading fabric rolls onto the machine. To load or unload the fabric rolls, plaintiff was required to lift and carry the rolls. The weight of the rolls varied, depending on the type and amount of fabric on the roll. The rolls weighed up to eighty-eight pounds.
4. The worker responsible for off-loading finished patterns lifted the cut patterns from the table and placed them onto a separate table in stacks of like fabric and patterns. When a set of like patterns was completed, this worker bundled the patterns for transfer to another workstation. The duties of this position also required the worker to use manual scissors to trim the finished patterns after they were cut by the machine.
5. In 1995, plaintiff began working in the "cutting lead" position. In this position, plaintiff was responsible for supplying fabric cutters with rolls of fabric. He was also responsible for assisting cutters with problems they might encounter. He also sorted tickets. The rolls of fabric plaintiff supplied to the cutters weighed up to eighty-eight pounds. He lifted approximately fifty rolls of fabric each day. Occasionally, plaintiff lifted rolls of fabric throughout the majority of his work shift. Plaintiff was not required to cut fabric while he was employed in this position.
6. In April 1996, plaintiff began working in the "UPS expediter" position. In this position, plaintiff was responsible for obtaining and packaging samples of fabric and other furniture components for shipment to defendant's customers. To obtain fabric samples, plaintiff lifted a roll of fabric from a cart, carried the roll to a cutting table, placed the roll onto a roller and pulled the end of the fabric to a new roll. Once the fabric was positioned on the table, plaintiff activated a machine that caused the fabric sample to roll off the original roll and onto the sample roll. Once the designated amount of fabric had been placed on the sample roll, plaintiff separated the two rolls by cutting the fabric. For a period of six months, plaintiff used manual scissors to cut the fabric. Thereafter, he used a utility knife to cut the fabric. Plaintiff then returned the original roll to the cart, inserted the sample roll into a paper shipping sleeve and sealed the plastic sleeve. Finally, he placed a computer generated shipping label onto the outside of the sample package. The original rolls of fabric weighed up to eighty-eight pounds. On average, plaintiff prepared fifty fabric samples for shipping each day.
7. In the "UPS expediter" position, plaintiff was also responsible for stuffing, packaging and shipping bolsters or throw pillows. To stuff a bolster, plaintiff held the cover with one hand while pushing the filling into the cover with his other hand. He then used both hands, with fingers extended, to properly position the filling inside the cover. He next placed the bolster into a shipping box, taped the box closed, attached a computer generated shipping label to the box and placed the box into a stack for shipment via UPS. Plaintiff's usual practice was to stuff and package approximately fifty bolsters at one time.
8. Plaintiff was also responsible for assembling each cardboard box he used for shipping bolsters or other furniture components. To assemble a box, plaintiff opened the flattened cardboard box, folded the end flaps into place and secured the flaps with tape from a hand held tape dispenser. Plaintiff placed two strips of clear plastic tape onto each end of the box, applying pressure to the tape and dispenser to secure the flaps into place. Plaintiff made boxes for approximately two and one-half hours per day. The remainder of his time was divided between preparing fabric samples and stuffing bolsters. At times, plaintiff would spend his entire work shift stuffing bolsters or preparing fabric samples. At least one day per week, the "UPS expediter's" workload was sufficiently great that defendant assigned another employee to assist plaintiff with his usual duties.
9. In February 1997, plaintiff began experiencing pain in his upper extremities. His pain increased during the performance of his usual work duties. At times, plaintiff experienced a sharp pain that radiated from his upper arm into his lower arm. The pain plaintiff experienced was most severe when he lifted rolls of fabric. Plaintiff also experienced numbness in his fingers.
10. Plaintiff initially sought treatment for these symptoms from his family physician, Dr. Merrill. Dr. Merrill, believing that plaintiff's symptoms were caused by an abnormality in his cervical spine, referred plaintiff to Dr. Rosenfeld. A myelogram and post-myelogram CT scan ordered by Dr. Rosenfeld revealed no cervical abnormality. Therefore, he ordered additional diagnostic studies of plaintiff's upper extremities to rule out carpal tunnel syndrome as the cause of plaintiff's symptoms. These studies revealed that plaintiff had bilateral carpal tunnel syndrome, right greater than left. Dr. Rosenfeld prescribed physical therapy. This treatment failed to significantly improve plaintiff's condition.
11. Carpal tunnel syndrome is a condition that is caused by cumulative trauma. The trauma may be caused by repetitive flexion and extension of the wrists. These kinds of physical movement create inflammation around the tendons in the wrists. Some of the inflammation may become permanent, resulting in a thickening of the lining on the wrist tendons. An individual may develop significant thickening of the lining on the tendons without developing carpal tunnel syndrome. However, additional trauma caused by wrist flexion and extension may cause the development of carpal tunnel syndrome.
12. Plaintiff began treatment with Dr. Anthony DeFranzo, a surgeon at North Carolina Baptist Hospital, on August 20, 1997. On September 15, 1997, Dr. DeFranzo performed right carpal tunnel release surgery on plaintiff. Although plaintiff was released several weeks later to return to light duty work, defendant had no suitable work available.
13. On February 16, 1998, Dr. DeFranzo performed left carpal tunnel release on plaintiff. Dr. DeFranzo released plaintiff to light duty, non-repetitive work lifting ten to fifteen pounds on March 24, 1998.
14. An ergonomic evaluation of the jobs performed by plaintiff at defendant-employer was done by Alan Gorrod, president and owner of Triad Therapy Services. Mr. Gorrod's evaluation showed that the various arm/hand movements required in plaintiff's jobs did not expose him to an increased risk of contracting carpal tunnel syndrome. The Commission, however, gives greater weight to the medical causation testimony of Dr. DeFranzo who is board certified in hand surgery, plastic surgery, general surgery and microsurgery.
15. Plaintiff's bilateral carpal tunnel syndrome was caused by cumulative trauma in his employment with defendant since 1987. Plaintiff's employment with defendant since 1987 placed him at an increased risk of developing or significantly aggravating his carpal tunnel syndrome as compared to members of the general public not so employed.
16. As a result of his carpal tunnel syndrome, plaintiff was unable to return to regular work for defendant after 5 March 1997. On more than one occasion since 5 March 1997, plaintiff sought to return to work for defendant in a position that was consistent with the physical restrictions imposed by his treating physicians. Although defendant did not terminate plaintiff's employment, it refused to provide plaintiff with employment that was consistent with his physical restrictions.
17. Since defendant continued to employ plaintiff, his efforts to return to work for defendant after 5 March 1997 constitute a reasonable job search.
18. As a result of his carpal tunnel syndrome, plaintiff was rendered incapable of earning wages from defendant or any other employer from 6 March 1997 to the present.
19. Since 6 March 1997, defendant has paid plaintiff disability benefits of $2,730.00 from a policy funded solely by defendant. These payments were not due and payable when made.
20. Prior to 6 March 1997, plaintiff's average weekly wage was $489.93.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's bilateral carpal tunnel syndrome was due to causes and conditions that were characteristic of and peculiar to his employment with defendant and, therefore, was an occupational disease. G.S. § 97-53(13).
2. As a result of his carpal tunnel syndrome, plaintiff is entitled to payment of temporary total disability compensation at the rate of $326.64 per week from 6 March 1997 and continuing until order of the Industrial Commission allowing defendant to cease payment of temporary total disability compensation. G.S. § 97-29.
3. Plaintiff is entitled to payment of all medical expenses incurred as a result of his carpal tunnel syndrome for so long a such treatments, examinations and evaluations tend to effect a cure, provide relief or lessen his period of disability. G.S. § 97-59.
4. Defendant is entitled to a credit of $2,730.00 against the temporary disability compensation due plaintiff. G.S. § 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $326.64 per week from 6 March 1997 and continuing until order of the Industrial Commission allowing defendant to cease payment of temporary total disability compensation. To the extent that this amount has accrued, it shall be paid in a lump sum, subject to the attorney's fee approved in paragraph 4 and the credit due defendant in paragraph 3.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of his carpal tunnel syndrome for so long as such treatments, examinations and evaluations tend to effect a cure, provide relief or lessen his period of disability.
3. Defendant shall receive a credit of $2,730.00 against the temporary total disability compensation due plaintiff.
4. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff is approved for plaintiff's attorney and shall be paid as follows: twenty-five percent of the lump sum due plaintiff under paragraph 1, after the credit due defendant, shall be deducted from that amount and paid directly to plaintiff's attorney. Thereafter, plaintiff's attorney shall receive every fourth compensation check due plaintiff.
5. Defendant shall pay the costs, including an expert witness fee for Mr. Gorrod not to exceed $100.00.
This the ___ day of February 1999.
 S/_________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/______________________ BERNADINE S. BALLANCE COMMISSIONER
S/______________________ THOMAS J. BOLCH COMMISSIONER